489 So.2d 89 (1986)
SHELBY LIFE INSURANCE COMPANY, Appellant,
v.
Susanne Eckman PAOLASINI, Ronald Wayne Paolasini, Jr. and Anthony Wayne Paolasini, Appellees.
No. 85-1324.
District Court of Appeal of Florida, Third District.
April 29, 1986.
Rehearing Denied June 13, 1986.
Carey, Dwyer, Cole, Eckhart, Mason & Spring and Pamela Beckham, Miami, for appellant.
Dennis G. King, Miami, for appellees.
Before SCHWARTZ, C.J., and NESBITT and BASKIN, JJ.
SCHWARTZ, Chief Judge.
Within six months before he applied, in April 1982, for reinstatement of his lapsed $100,000 life insurance policy with the Shelby Life Insurance Company, Paolasini had been suffering from repeated chest pains; had seen two doctors, Dr. Greenberg, his treating physician, and Dr. Berger of the Miami Heart Institute; had been informed that he may be suffering from heart disease; and was regularly taking medication, including nitroglycerine tablets, to alleviate the problem. Nonetheless, while he answered "yes" on the application as to whether he had seen a physician or had any sickness during the relevant period, in a response to a request for
Full Details  Names; Ailments; Dates; Physicians' Names, ...
he stated only the following:
Physical Check-Up
Dr. Greenberg

*90 1750 Jefferson
Hollywood Fla
Had Flu.
Upon receipt of the application, Shelby duly reinstated the policy. About two months later, Paolasini died of a massive heart attack and his beneficiaries sued Shelby for the policy benefits. They won a jury verdict and judgment below, but we reverse on the ground that Shelby's motions for directed verdict should have been granted.
It is entirely clear that the insured's answer to the request for full descriptions of his "ailments" and his "physicians' names" was false and misleading in its omission both of Dr. Berger's name, and, more important, of any hint whatever of the serious condition from which he had been suffering and for which he was being treated. There is no doubt that recovery under the policy is therefore precluded as a matter of law by virtue of section 627.409(1), Florida Statutes (1981).[1] In Continental Assurance Co. v. Carroll, 485 So.2d 406 (Fla. 1986),[2] the supreme court readopted and reemphasized its previous holding in Life Insurance Co. v. Shifflet, 201 So.2d 715 (Fla. 1967), that even a nonintentional or unknowing misstatement invokes the statute and invalidates the resulting policy
where either the misrepresentation materially affects the acceptance of risk or the insurer would not have issued the policy under the same terms had it known the true facts.
Carroll, 485 So.2d at 408. Since it was undisputed below, and is indeed obvious in any event, that the omitted information as to Paolasini's health directly affected the nature of the risk and Shelby's willingness to accept it, Carroll and Shifflet compel reversal.
We find no merit in the appellees' various arguments for the contrary result. They rely heavily, for example, upon the fact that the application, although signed by Paolasini, was apparently filled in by Shelby's agent, Jeffrey Caminiti, who told the insured merely to give the doctor's name and that "if they needed to, [Shelby] would check ... with the doctor's records."[3] See American Bankers Life Assurance Co. v. Toth, 165 So.2d 804 (Fla. 3d DCA 1964), cert. denied, 169 So.2d 389 (Fla. 1964). The insurmountable difficulty *91 with this position is that the agent's advice to this effect was based upon a description of his health by Paolasini which omitted material facts about his condition and his having seen Dr. Berger; thus, if only that statement had been made directly to the company, it would have itself resulted in a vitiation of the policy under Carroll and Shifflet. See 7 Couch on Insurance 2d § 37:127 (rev. ed. 1985) ("Where the applicant correctly informs the insurer's representative as to his health and physical condition, the insurer cannot take advantage of the answer as recorded by such agent." [e.s.]).
Similarly unavailing is the claim that, because Shelby did not, as it was authorized, contact Dr. Greenberg or secure his records, it may not rely upon the fact that Paolasini did not himself reveal what it would have learned if it had done so. The cases relied upon for this argument, e.g., Columbian National Life Insurance Co. v. Lanigan, 154 Fla. 760, 19 So.2d 67 (1944)  which hold generally that when an insurer is on notice that it must itself make further inquiries about an insured's health, it is bound by what a reasonable investigation would have shown  have no pertinence here.[4] This is because Paolasini's answer did not state Dr. Greenberg's name and give no further detail; such a response might have indicated that further information was required to fill in the obvious gap as to the nature of the particular ailment. See 43 Am.Jur.2d Insurance § 1008 (1982). Instead, the application affirmatively misstated that the reasons for the visit and Dr. Greenberg's treatment were a "physical check-up" and because he "had flu."[5] It is apparent, and Shelby's underwriter specifically so testified at the trial, that an innocuous report like this would not call for the insurer to make further inquiry from the physicians in question. Since, as Carroll holds, Shelby was entitled to rely on the truthfulness of the "flu" response, the beneficiaries may not be heard to say that the carrier should have undertaken to determine whether there was some other unrevealed malady. See DiBenedetto v. Continental Assurance Co., 11 Mass. App. Ct. 910, 414 N.E.2d 1036 (1981) (insured's answer to request for listing of physicians' names and reasons for consultation which named one doctor, one date, and stated "no problems" material misrepresentation when doctor saw patient at least five times for treatment of high blood pressure); Inglish v. United Services General Life Co., 394 So.2d 960, 962 (Ala. Civ. App. 1980) (insurer under no obligation to secure air force records, which would have revealed other treatment, in light of statement that insured's examination was for "Annual A[ir] F[orce] Physical"), cert. denied, 394 So.2d 967 (Ala. 1981); Hatch v. Woodmen Accident & Life Co., 88 Ill. App.3d 36, 42 Ill. Dec. 925, 928, 409 N.E.2d 540, 543 (1980) (insured's response revealing single specific ailment was "equivalent of a direct assertion that [it] was the only medical problem of which he had been made aware"); see also Owens v. Sun Life Insurance Co., 287 So.2d 408 (Fla. 2d DCA 1973) (misrepresentation that applicant with vision problem saw eye doctor only for "glasses"); see generally 1A J. Appleman, Insurance Law and Practice § 250 (1981) ("If the information given by the insured is of such a nature as to warrant the company in accepting it as true, without additional investigation, the fact that it makes no further inquiry upon those matters does not deprive it of the defense of concealment of material facts.").
For these reasons, the judgment under review is reversed and the cause remanded for the entry of judgment for the carrier.
Reversed.
NOTES
[1] § 627.409(1), Fla. Stat. (1981), provides:

(1) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:
(a) Fraudulent; or
(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.
[2] Carroll, which controls the outcome of this case, was decided subsequent to the proceedings below.
[3] Paolasini's wife testified as follows concerning the conversation between her husband and Caminiti:

A. Well, basically I didn't say anything. Jeff asked him the questions and they went over the form, and then Ron signed it and Diane witnessed it and asked him if he had been seeing a doctor and Ron told him yes, and he says some days I feel lousy and some days I feel good. But he knew that he was seeing a doctor. And he put the doctor's name down, and he asked for the doctor's address.
.....
Q. Yes. What did he tell Mr. Caminiti about his health condition?
A. That he is taking medication, and most of the time it worked and sometimes he didn't feel too good. And like I said, he told him that he was seeing a doctor.
Q. And was the doctor's name mentioned?
A. Yes.
Q. What did Mr. Caminiti say about the doctor?
A. That it wasn't up to him to decide whether or not the policy would be reissued. If they needed to, they would check, the company would check with the doctor's records.
[4] We need not decide whether this doctrine survives Carroll.
[5] Admittedly, the statement that Paolasini "had flu" was not true.